UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                                          Case Number 10-20635
                    Plaintiff,                            Honorable David M. Lawson

v.

HECTOR SANTANA, MANUEL ANTONIO
SOTO, CHRISTOPHER ESPINOZA, and
JUAN RAMON RESPARDO-RAMIREZ,

                    Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL OR NEW TRIAL

Before the Court are motions by four defendants for judgment of acquittal or new trials. The government has responded and the motions are fully briefed. The Court has reviewed the submissions of the parties and finds that the relevant law and facts have been set forth in the motion papers and that oral argument will not aid in the disposition of the motion. Accordingly, it is **ORDERED** that the motion be decided on the papers submitted. *See* E.D. Mich. LR 7.1(f)(2).

Following a jury trial, the defendants were convicted of various conspiracies dealing with kidnapping, drug and firearm offenses. Defendant Manuel Antonio Soto also was convicted of obstruction of justice. The defendants raise challenges to their convictions based on the sufficiency of the evidence. Some of the challenges are similar; others are not. In addition, defendant Soto raises a challenge based on the failure of his trial counsel to challenge four search warrants. The Court will discuss the defendants' challenges to each count of the indictment together and then address defendant Soto's challenge based on his claim of ineffective assistance of counsel.

I.

The facts of the case are well known to the parties.  For context, the Court will summarize the trial evidence relevant to the motions.

The four defendants in this case were charged in a Fourth Superseding Indictment filed on April 2, 2013 with five counts: conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(ii)(II) (count I), conspiracy to kidnap in violation of 18 U.S.C. § 1201(a)(1)(C) (count V), kidnapping, aiding and abetting in violation of 18 U.S.C. § 1201 (count VI), possession of a firearm in furtherance of and during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) (count VII), and possession of a firearm in furtherance of and during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (count VIII).  The guns charged in counts VII and VIII were a Llama Mini Max 45-caliber sub-compact semi-automatic handgun, a Pietro Beretta Model 92 9mm caliber semi-automatic, and a Colt Model Cup National Match Model 45-caliber semi-automatic handgun with serial number NM50277.  In addition, defendants Hector Santana, Manuel Antonio Soto, and Christopher Espinoza were charged with possession with intent to distribute 500 grams or more of cocaine, aiding and abetting in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II) (count II) and defendant Manuel Antonio Soto was charged with obstruction of justice, tampering with a witness, victim or an informer in violation of 18 U.S.C. § 1512(b)(1), (2)(A).  The indictment charged that the defendants were involved in a cocaine trafficking conspiracy between November 26, 2008 and January 23, 2012 and that in October 2009 the defendants conspired to kidnap Jose Ezequiel Enriquez-Enriquez for the purpose of collecting a drug debt.  After a jury trial, the

defendants were convicted of all charges with the following exceptions: defendant Espinoza was acquitted of count I and defendant Respardo-Ramirez was acquitted of count V.

At trial, the government presented testimony from Erik Freeman, Vanissa Gudino, and Jose Bravo-Garcia, along with several law enforcement officers.

Erik Freeman testified that he was involved in selling cocaine with Jose Enriquez-Enriquez and Francisco Enriquez-Enriquez. Trial Tr. Apr. 22, 2013 at 9-10. The Enriquez-Enriquez brothers sold Freeman cocaine that they obtained from suppliers in Chicago, including defendant Santana and Bravo-Garcia. *Id*. at 11-12. Freeman testified that in October 2009, Jose Enriquez-Enriquez called him and told him that he had cocaine to sell from his sources in Chicago. *Id*. at 23. Freeman met with Enriquez-Enriquez, Santana, Bravo-Garcia, Espinoza, Bravo-Garcia's girlfriend, and a man with facial tattoos. *Id*. at 25-27. They proceeded to a house on Washburn in two separate cars, and Enriquez-Enriquez, Santana, and Bravo-Garcia walked kilograms of cocaine into the residence one at a time. *Id*. at 29-30. Freeman cooked some of the cocaine to ensure that it was pure. *Id*. at 31. The group then moved to a house on Asbury Park to complete the transaction. *Id*. at 32-33. Freeman entered the house carrying the money with the other men walking behind him. *Id*. at 36-37. Bravo-Garcia, Espinoza, and the man with the facial tattoos pulled out guns and pointed them at Freeman. *Id*. at 39. Freeman asked the men to take the money and leave. *Ibid*. Bravo-Garcia told Freeman to go into the basement, where Freeman was duct-taped to a pole. *Id*. at 39-40. Either Espinoza or the man with facial tattoos removed Freeman's wallet, keys, and phone from his pocket. *Id*. at 41. Freeman freed himself about an hour later. *Id*. at 86. The government introduced intercepted conversations between Freeman and several of his associates relating to cocaine transactions, the robbery, and the kidnapping. *Id*. at 51-83.

Vanissa Gudino testified that Jose Bravo-Garcia was her ex-boyfriend and that he was involved in dealing cocaine. Trial Tr. Apr. 22, 2013 at 172, 174. Through her relationship with Bravo-Garcia, she met defendant Santana, who she called Bravo-Garcia's right-hand man. *Id*. at 175-76. According to Gudino, defendant Santana picked up and delivered cocaine from defendant Soto for Bravo-Garcia. *Id*. at 177. Jose Bravo-Garcia testified that defendant Soto sold him kilograms of cocaine at a rate of approximately six to eight kilograms per week. Trial Tr. Apr. 30, 2013 at 34. Defendant Respardo-Ramirez delivered the cocaine to Bravo-Garcia on defendant Soto's behalf. *Id*. at 35. Bravo-Garcia sold cocaine to Freeman through Jose Enriquez-Enriquez. *Id*. at 40. Bravo-Garcia testified that defendant Santana worked for him delivering cocaine, including a delivery of five kilograms of cocaine to Freeman in October 2009. *Id*. at 41, 43. Bravo-Garcia testified that a plan to deliver ten kilograms of cocaine on behalf of defendant Soto to Jose Enriquez-Enriquez and, in turn, to Freeman, went awry when a middleman took the drugs without paying for them. *Id*. at 48-56.

In October 2009, Gudino and Bravo-Garcia made two trips to Detroit. Trial Tr. Apr. 22, 2013 [hereinafter Gudino] at 181; Trial Tr. Apr. 30, 2013 [hereinafter Bravo-Garcia] at 57. The first trip included Gudino, Bravo-Garcia, defendant Santana, defendant Espinoza, and Anthony Ramirez. Gudino at 182; Bravo-Garcia at 57. The purpose of the trip was to collect the money owed for the cocaine that Bravo-Garcia fronted or to kidnap the person who had stolen the money; defendant Soto had been "hounding" Bravo-Garcia for the money or for the person who had received the drugs. Gudino at 183; Bravo-Garcia at 56. All of the individuals involved were aware of the purpose of the trip and bought zip ties to restrain the victim. Gudino at 190, 194; Bravo-Garcia at 58-59, 71. The plan was for Bravo-Garcia to pretend to do a drug transaction with the victim, Jose Enriquez-

Enriquez.  Gudino at 196; Bravo-Garcia at 59.  Defendants Santana and Espinoza confronted Enriquez-Enriquez with guns and forced him and another unidentified individual into a minivan. Gudino at 196-97; Bravo-Garcia at 68-69.  They drove to Chicago, where defendants Soto and Respardo-Ramirez joined them.  Gudino at 205; Bravo-Garcia at 72-73.  Defendant Soto was holding a gun; according to Bravo-Garcia, defendant Respardo-Ramirez also was carrying a gun in the waistband of his pants.  Trial Tr. Apr. 23, 2013 [hereinafter Gudino 2] at 6; Bravo-Garcia at 74. After questioning the victims for approximately an hour, defendant Soto left and defendant Respardo-Ramirez remained to watch the victims.  Gudino 2 at 11; Bravo-Garcia at 87.  At that point, defendant Respardo-Ramirez was holding a gun and occasionally placing the gun on a table. Gudino 2 at 12-13.

The next day, Gudino and Bravo-Garcia went on the second trip to Detroit.  Gudino 2 at 16; Bravo-Garcia at 87, 90.  The purpose of the trip was to rob Freeman, an associate of Enriquez-Enriquez, to recover the money owed to defendant Soto, who agreed to the plan.  Gudino 2 at 16; Bravo-Garcia at 87-88.  On the trip were Gudino, Bravo-Garcia, Anthony Ramirez, defendant Espinoza, defendant Santana, and Enriquez-Enriquez. Gudino 2 at 19-20; Bravo-Garcia at 87.  They brought three kilograms of cocaine and three guns, two of which had been provided by defendant Soto.  Gudino 2 at 21; Bravo-Garcia at 88-89.  Bravo-Garcia testified that defendant Respardo-Ramirez had nothing to do with the guns.  Trial Tr. May 1, 2013 at 65-67.  Bravo-Garcia also testified that the guns were the same guns that had been used during the kidnapping the day before. Bravo-Garcia at 89.  The unknown victim remained in Chicago with defendant Respardo-Ramirez. Gudino 2 at 49; Bravo-Garcia at 87.  When the group met Freeman, they gave Freeman the cocaine to test one kilogram at a time.  Gudino 2 at 28; Bravo-Garcia at 98-100.  Freeman entered a house

to retrieve money to pay for the cocaine, and Bravo-Garcia, Espinoza, Ramirez, and Santana followed him in, carrying guns. Gudino 2 at 32-33; Bravo-Garcia at 102, 105. Bravo-Garcia, Espinoza, and Ramirez pointed guns at Freeman and Freeman and Enriquez-Enriquez dropped to the ground. Bravo-Garcia at 105-06. According to Bravo-Garcia, defendant Santana was not carrying a gun originally, but Bravo-Garcia handed him a gun after Enriquez-Enriquez and Freeman dropped to the floor. *Ibid.* Bravo-Garcia took the money out to the van, and returned to the house, where, he testified, defendant Santana had tied Freeman to a pole in the basement. *Id*. at 107. The men returned to the cars with money and the cocaine and drove away. Gudino 2 at 38, 40; Bravo-Garcia at 111. Both cars were pulled over by police. Gudino 2 at 38-39; Bravo-Garcia at 115-17. Bravo-Garcia called defendant Soto to inform him that they had been stopped by police and kept the phone connected during the stop so that Soto would believe him. Gudino 2 at 41; Bravo-Garcia at 116. After they were released by the police, Gudino and Bravo-Garcia returned to Chicago in a cab, and the unknown victim was no longer there. Gudino 2 at 48-49.

Jon Gerksy testified that on October 22, 2009, when he was employed as a City of Taylor police officer, he pulled over a car being driven by Jose Enriquez-Enriquez, whom he arrested for driving with a suspended license. Trial Tr. Apr. 30, 2013 at 7-9. Defendants Espinoza and Santana also were present in the car. *Id*. at 10. The car was impounded, but no drugs or weapons were found. *Id*. at 12. Brian Shock, a police officer with the City of Roseville, testified that on October 22, 2009, he pulled over a minivan being driven by Gudino. Trial Tr. May 1, 2013 at 184-85. Gudino, Bravo-Garcia, and Ramirez were present in the minivan. *Id*. at 189. Upon searching the minivan, Shock discovered a secret compartment containing a large quantity of currency, cocaine, and a handgun. *Id*. at 195-96. Shock testified that three handguns eventually were recovered from

-6-

the minivan.  *Id.* at 198.  Benjamin Swincicki, a special agent with the United States Drug Enforcement Administration, identified the three handguns recovered from the minivan as those charged in the indictment.  Trial Tr. May 2, 2013 at 18, 22-25.

John Elstner, an officer with the Chicago Police Department, testified that he executed a search warrant at 4309 West 77th Place in Chicago, Illinois on January 27, 2010 and found defendant Soto there.  Trial Tr. Apr. 23, 2013 at 187-88.  Elstner testified that the police recovered approximately $400,000 in U.S. currency, two assault rifles, and two handguns.  *Id.* at 192-93.  The parties stipulated to the admission of evidence recovered from 5038 South Ridgeway, Chicago, Illinois and 5318 Mozart, Chicago, Illinois.  *Id.* at 207, 209.

At the conclusion of the government's case, each of the defendants moved for a judgment of acquittal, which the Court denied.  The motions were renewed after the verdicts were returned.

## II.

When addressing a motion for judgment of acquittal under Rule 29(c), the Court must view the evidence in the light most favorable to the prosecution and determine whether there was sufficient evidence offered at trial to convince a rational trier of fact beyond a reasonable doubt that all of the elements of the charged crimes had been established.  *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010); *see also Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).  "The relevant question in assessing a challenge to the sufficiency of the evidence is whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. McAuliffe*, 490 F.3d 526, 537 (6th Cir. 2007); *see also Jackson*, 443 U.S. at 319.  The evidence need not exclude every theory of innocence.  *Jackson*, 443 U.S. at 319.  The testimony of a single witness is generally sufficient to demonstrate guilt beyond a reasonable doubt.  "The prosecution,

however, must present substantial evidence as to each element of the offense from which a jury could find the accused guilty beyond a reasonable doubt." *Brown v. Davis*, 752 F.2d 1142, 1145 (6th Cir. 1985) (internal citation omitted). Where the evidence is at least as indicative of innocence as guilt, the Court must direct a verdict of acquittal. *United States v. Berger*, 224 F.3d 107, 116 (2d Cir. 2000).

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The decision whether to grant a new trial is left to the sound discretion of the district court." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). "A reversal based on the verdict being against the manifest weight of the evidence is proper when the government has presented sufficient evidence to convict, but the judge disagrees with the jury's resolution of conflicting evidence." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). "A district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial, may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (citing *Lutz*, 154 F.3d at 589). Moreover, "it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (citing cases).

### A. Count I: Conspiracy to Distribute Five Kilograms or More of Cocaine

Only defendant Respardo-Ramirez challenges his conviction under count I of the indictment. He argues that there was no evidence demonstrating that there was an agreement between the conspirators; instead, the only evidence offered was evidence that Respardo-Ramirez delivered

drugs from Soto to Bravo-Garcia.  Respardo-Ramirez argues that there is no evidence that those transactions were charged in the indictment and that the only evidence is Bravo-Garcia's testimony.

As discussed above, Jose Bravo-Garcia testified that for about a year, Soto sold him kilograms of cocaine at a rate of approximately six to eight kilograms per week and that Respardo-Ramirez delivered the cocaine to Bravo-Garcia on Soto's behalf around twenty times, each time bringing between two and five kilograms of cocaine.  That testimony alone is sufficient evidence for the jury to conclude that Respardo-Ramirez was involved in a conspiracy to distribute five kilograms or more of cocaine with Soto.  The jury reasonably could infer from testimony that Respardo-Ramirez was delivering drugs on behalf of Soto and that the two defendants had an agreement.  There was also sufficient evidence from which the jury could infer that the conspiracy existed during the dates of the indictment — between November 26, 2008 and April 2, 2013 — because the vast bulk of the testimony concerned events occurring in October 2009 that were connected with the conspiracy to distribute cocaine.  In fact, under the government's theory, the kidnapping and robbery were both attempts to collect drug debts arising out of the conspiracy charged in count I.  The fact that the testimony directly linking Respardo-Ramirez to the conspiracy came from Bravo-Garcia does not mandate either a judgment of acquittal or a new trial.  "Testimony by co-conspirators alone can be sufficient to prove the existence of a conspiracy."  *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003).  Respardo-Ramirez is not entitled to a judgment of acquittal or a new trial on count I of the indictment.

B.  Count II: Possession with Intent to Distribute 500 or More Grams of Cocaine

Defendants Santana, Espinoza, and Soto challenge their convictions on count II of the indictment relating to the three kilograms of cocaine brought from Chicago to Detroit as bait for the

-9-

robbery of Freeman.  They argue that there was no intent to distribute the cocaine; instead, the defendants insist that the evidence demonstrated that they intended to use the cocaine as a ruse to rob Freeman and that they never intended to transfer actual possession of the cocaine to Freeman. The government responds that the transfer of the drugs to Freeman for testing constituted delivery sufficient to satisfy the requirement.

The Court agrees with the government.

The defendants were charged under 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii)(II).  Those statutes, read together, make it illegal for a person to "knowingly or intentionally . . . possess with intent to manufacture, distribute, or dispense" 500 grams or more of cocaine.  21 U.S.C. § 841(a)(1). For the purposes of the statute, to distribute is "to deliver (other than by administering or dispensing) a controlled substance."  21 U.S.C. § 802(11).  To deliver, in turn, means "the actual, constructive, or attempted transfer of a controlled substance."  21 U.S.C. § 802(8).  "The crime of possession of cocaine with intent to distribute is a specific intent crime such that the defendant's intent is a statutory element of the offense."  *United States v. Hardy*, 643 F.3d 143, 151 (6th Cir. 2011).

The defendants' argument is that they intended only to give Freeman the drugs temporarily for inspection without intending to relinquish actual possession or control over them.  Therefore, the defendants reason, they cannot be said to have transferred the cocaine to Freeman.  Essentially, the defendants are arguing that because they intended to take the cocaine back from Freeman after Freeman tested it or, conversely, because they did not intend for Freeman to have permanent possession of the cocaine, they did not really transfer the cocaine to Freeman.  That is an argument for *de minimis* transfer: because Freeman only had the cocaine for a short time and because the defendants planned to take it back, there wasn't *really* any transfer.  That conclusion is not

-10-

compelled by the statutory language and the defendants have not supported their argument with any case law.

This case is usefully compared with *United States v. Cortes-Caban*, 691 F.3d 1 (1st Cir. 2012). There, three police officers were involved in a conspiracy to give previously seized drugs and drug paraphernalia to agents prior to the execution of a search warrant so that the agents could plant the contraband and "seize" it during a search, ensuring that an arrest would ensue. The defendants argued that they lacked specific intent to distribute controlled substances, because they did not intend to distribute the substances; their intent was to fabricate criminal cases by planting evidence. The First Circuit found that that argument conflated "the specific intent to distribute required by the statute with the very different question of the ultimate objective." *Id*. at 23. The court reviewed the statutory definition of "distribute," noting that courts have defined the term broadly to include conduct beyond the sale of narcotics. The court concluded that the defendants' conduct in taking the drugs from the place they had been stored and planting them on the victims constituted transfer of those drugs within the meaning of the statute, even though the purpose of the transfer was to "discover" the drugs and arrest the victim. *Id*. at 18.

Similarly, here, the defendants' argument confuses the existence of a specific intent to distribute — that is, transfer the drugs to Freeman — with the ultimate objective of the transfer: to induce Freeman to expose his drug money supply so the defendants could steal it. The fact that the defendants intended to regain possession of the cocaine after transferring it to Freeman does not negate the fact that they transferred the drugs to him when they gave him the drugs to test. *See Cortes-Caban*, 691 F.3d at 23. The evidence in this case proves a drug delivery.

-11-

2:10-cr-20635-DML-MKM   Doc # 515   Filed 08/12/13   Pg 12 of 37   Pg ID 3455

Defendant Espinoza raises several additional challenges to his conviction on count II of the indictment. In his written motion, Espinoza argues that because of the government's failure to offer proof of the intent to distribute, the government's proofs at trial varied from the indictment. The government argues that no variance occurred because the evidence demonstrated that multiple crimes occurred but did not compel a conclusion that multiple conspiracies existed. However, as just discussed, the government did offer sufficient evidence to demonstrate an intent to distribute. Espinoza's "variance" argument fails. Espinoza also argues that there was no evidence that he joined a drug conspiracy. As the government correctly notes, however, count II does not charge conspiracy, but rather possession. Espinoza was acquitted on the drug conspiracy count.

In his oral motion for a judgment of acquittal, Espinoza argued that there was no evidence that he had ever actually or constructively possessed the cocaine. In his written motion, he contends that he was convicted based on nothing more than his association with drug dealers. In order to prove that Espinoza was guilty of possession of cocaine with intent to distribute, the government was required to prove either actual or constrictive possession. *United States v. Wettstain*, 618 F.3d 577, 585-86 (6th Cir. 2010). However, because the government charged Espinoza as an aider and abettor, the government was not required to prove actual possession; instead, the government could prove that Espinoza "associate[d] himself with the venture such that his participation [was] intended to bring about the crime or make it succeed." *United States v. Clark*, 928 F.2d 733, 736 (6th Cir. 1991). As detailed in the facts section above, the government presented abundant evidence, in the form of the testimony of Gudino, Bravo-Garcia, and Freeman, that Espinoza was not only present during but also participated in the robbery of Freeman, which in turn was made possible only by the possession and transfer of cocaine, at least temporarily, to Freeman. In addition, Bravo-Garcia

-12-

testified that Espinoza was present in the minivan carrying the cocaine on the way from Chicago to Detroit and was present when the cocaine was transferred to Freeman. Bravo-Garcia 88-90, 99. That evidence is sufficient to convict Espinoza on count II of the indictment.

### C.  Counts V and VI: Conspiracy to Kidnap and Kidnapping

Defendants Santana, Espinoza, and Respardo-Ramirez each argue that there was insufficient evidence to support their convictions on both the conspiracy to kidnap and kidnapping charges. Santana argues that the testimony of Gudino and Bravo-Garcia was unreliable because they were testifying pursuant to a Rule 11 plea agreement. Santana points to Gersky's testimony that Jose Enriquez-Enriquez was driving during the traffic stop on October 22, 2009 and no evidence was found in the car to indicate a kidnapping; and Lynch's testimony that the government did not learn about the kidnapping until a year or two after the fact. Espinoza argues that there is no evidence that he conspired with anyone to kidnap Jose Enriquez-Enriquez or the unknown individual. Espinoza also argues that the witnesses who testified that he was involved in the kidnapping were not credible. The government responds that the evidence demonstrated not only that Jose Enriquez-Enriquez and another individual were kidnapped, but also that Santana and Espinoza were involved in the kidnapping.

There is no doubt that the testimony of Gudino and Bravo-Garcia provided sufficient evidence upon which a jury could find the defendants guilty of kidnapping and conspiracy to kidnap. As discussed in detail above, the government presented testimony that Gudino, Bravo-Garcia, Santana, Espinoza, and Anthony Ramirez traveled to Detroit to collect money that had been stolen from Bravo-Garcia, or to kidnap the person who had stolen the money, and that all of the individuals involved were aware of the purpose of the trip. Further, the government presented testimony that

-13-

Santana and Espinoza confronted Jose Enriquez-Enriquez with guns, forced him and another unidentified individual into a minivan, and drove to Chicago, where Soto and Respardo-Ramirez joined them, and Respardo-Ramirez was tasked with watching the victims. The defendants' arguments boil down to a contention that the governments' witnesses were not credible because they were testifying pursuant to Rule 11 agreements. That argument is insufficient to justify a judgment of acquittal on the kidnapping charges. The fact that the witnesses were testifying under plea agreements was brought out in front of the jury, and presumably the jury took that information into account in evaluating their credibility. As the Sixth Circuit has held, "[e]ven the uncorroborated testimony of an accomplice may support a conviction. The fact that the coconspirators were cooperating with the government as a result of a plea bargain does not change the result." *United States v. Stewart*, 628 F.3d 246, 255 (6th Cir. 2010) (alteration in original; internal quotation marks and citations omitted). The testimony of the coconspirators in this case is sufficient to support the jury's verdict.

The defendants also have moved for a new trial. A court may grant a new trial if "the interest of justice so requires." Fed. R. Crim. P. 33(a). The Court may grant a new trial if it believes the verdict is against the substantial weight of the evidence and in reaching this determination, the Court may evaluate the credibility of witnesses. *Lutz*, 154 F.3d at 589. Beyond general assertions that the government's witnesses were not credible, the defendants also have argued that Gerksy's testimony that on October 22, 2009 he pulled over a car being driven by Jose Enriquez-Enriquez demonstrates that Enriquez-Enriquez could not have been kidnapped. However, Gersky pulled the car over after the robbery of Freeman. At that point, the drug debt for which Jose Enriquez-Enriquez had been kidnapped had been vindicated by the robbery. The fact that Enriquez-Enriquez was

-14-

driving a car with Santana and Espinoza in it on October 22, 2009 therefore says nothing about whether Enriquez-Enriquez had been kidnapped the day before. Nor does the fact that Agent Lynch testified that the kidnapping did not come to light until later in the investigation create sufficient doubt as to the validity of the verdict to entitle the defendants to a new trial.

In his oral motion, defendant Espinoza argued that there was no evidence that either of the kidnapping victims were held for reward or ransom, which is an essential element of the offense. The defendants were charged under 18 U.S.C. § 1201(a)(1), which states that "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward *or otherwise* any person" who was "willfully transported in interstate or foreign commerce" is guilty of kidnapping. 18 U.S.C. § 1201(a)(1) (emphasis added). The "otherwise" language in the statute is interpreted broadly to include individuals held for any other reason. *United States v. Sensmeier*, 2 F. App'x 473, 476 (6th Cir. 2001) (citing *Gooch v. United States*, 297 U.S. 124, 127-28 (1936)). "In other words, 'otherwise' includes any objective of a kidnaping which the defendant may find of sufficient benefit to induce him to commit the kidnaping. The defendant need only hold the victim for some purpose of his own." *Ibid*. (internal quotation and citations omitted). The government presented ample evidence that the victims were kidnapped and held to secure payment of a drug debt. That purpose is sufficient to satisfy the requirements of the statute, and Espinoza's challenge fails.

Defendant Respardo-Ramirez argues that there was no evidence that the kidnapping victims were transported across state lines against their wills. The kidnapping statute requires that the victim be "willfully transported in interstate or foreign commerce." 18 U.S.C. § 1201(a)(1). Respardo-Ramirez contends that even if the victims initially were seized against their will (which Respardo-

-15-

Ramirez does not appear to contest), if the victims were no longer being held against their will at the time they crossed state lines, the kidnapping terminated before that element of the offense was completed. *See United States v. Toledo*, 985 F.2d 1462, 1467 (10th Cir. 1993). The difficulty with that argument is that the testimony demonstrated that the victims were forced into a minivan at gunpoint in Detroit and then were taken to a garage in Chicago, where they were guarded by Respardo-Ramirez, who was carrying a gun. The jury certainly could have inferred reasonably that if kidnapping victims were restrained by armed individuals at both ends of their journey, the victims did not consent to their transportation across state lines in the midst of the trip.

### D.  Count VII: Brandishing a Firearm During a Drug Trafficking Crime

Defendant Espinoza argued in his oral motion that because the evidence was insufficient to convict him of the drug trafficking crime charged in count II, he could not be convicted of count VII. That argument fails because Espinoza's conviction on count II is sound. He mounts no other challenge to the sufficiency of the evidence with respect to count VII.

Defendant Respardo-Ramirez argues that there was insufficient evidence to connect him to any of the three guns charged in the indictment. He points out that there was no testimony that he was present during either trip to Detroit, that he provided any of the firearms involved in the kidnapping or robbery, or that he ever used or possessed those firearms. Respardo-Ramirez highlights Bravo-Garcia's testimony that the guns charged in the indictment had no connection to him. The government argues that Respardo-Ramirez constructively possessed one or more of the firearms that were brandished during the drug conspiracy and kidnapping and that he was a part of the drug conspiracy and therefore liable under a theory of *Pinkerton* liability. In *Pinkerton v. United States*, 328 U.S. 640 (1946), the Supreme Court held that a conspirator can be found guilty of a

-16-

substantive offense committed by a co-conspirator and in furtherance of the conspiracy, as long as the co-conspirator's acts are reasonably foreseeable.

The government's first argument — that the defendant constructively possessed one or more of the firearms named in the indictment because they were on a table in the garage where the defendant was present — founders in two ways. *First*, the defendant was not charged or convicted of *possession* of a weapon in furtherance of a drug trafficking crime; the defendant was convicted of *brandishing*, that is, displaying the weapon during a drug trafficking crime. *See* 18 U.S.C. §§ 924(a)(1)(A), 924(a)(4). And the indictment was quite specific in describing the weapons charged. The jury was not instructed on a possession offense; it was instructed on a use offense. Even assuming that Respardo-Ramirez constructively possessed the firearms, that would be insufficient to support the defendant's conviction for brandishing the firearm, because possession and use are separate offenses that require distinct proofs. *United States v. Mackey*, 265 F.3d 457, 461 (6th Cir. 2001). Use, unlike possession, requires "some active employment." *Ibid.* (citing *Bailey v. United States*, 516 U.S. 137, 144 (1995)). Evidence that the defendant had constructive possession of the firearms would not be sufficient to demonstrate that the defendant actively employed the weapons, and the government presented no evidence of active employment of the firearms charged in the indictment by Respardo-Ramirez directly.

*Second*, even assuming that a showing of constructive possession were sufficient to uphold the conviction, the government presented no evidence to demonstrate that Respardo-Ramirez constructively possessed the firearms in the indictment. The only testimony as to Respardo-Ramirez's relationship to the firearms charged in the indictment was Bravo-Garcia's testimony that Respardo-Ramirez had no connection to them. The government's response asserts only that

-17-

Respardo-Ramirez was present in a garage where the three firearms were sitting on the table. However, that falls far short of proving constructive possession, which requires proof that a person "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Hadley*, 431 F.3d 484, 507 (6th Cir. 2005) (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)). Respardo-Ramirez's mere presence in a room with the firearms, without more, does not show that he had either the power or intention to exercise dominion or control over them. *United States v. Cochran*, 14 F.3d 1128, 1133 (6th Cir. 1994) ("[W]e long have maintained that '[m]ere possession on the scene plus association with illegal possessors is not enough' to establish constructive possession." (quoting *United States v. Birmley*, 529 F.2d 103, 107 (6th Cir. 1976)).

The government next argues that defendant Respardo-Ramirez is guilty of brandishing either as an aider or abettor or under a *Pinkerton* theory of co-conspirator liability. The government's *Pinkerton* arguments can be dismissed easily because the Court did not give a *Pinkerton* instruction and therefore the jury could not properly have convicted under a *Pinkerton* theory. *See Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949) (stating that a verdict on a *Pinkerton* theory requires "the submission of those fact issues to the jury"); *United States v. Mata*, 491 F.3d 237, 242-43 (5th Cir. 2007) (citing *United States v. Crain*, 33 F.3d 480, 486 n.7 (5th Cir. 1994)); *United States v. Luciano-Mosquera*, 63 F.3d 1142, 1150 n.3 (1st Cir. 1995) (stating that convictions could not be supported under a *Pinkerton* theory where no *Pinkerton* instruction was given to the jury) (citing *United States v. Torres-Maldonado*, 14 F.3d 95, 101 (1st Cir. 1994)); *United States v. Labat*, 905 F.2d 18, 23 (2d Cir. 1990); *United States v. Valdez-Reyes*, 165 F. App'x 387, 401 (6th Cir. 2006) ("In the absence of the trial court giving the jury *Pinkerton* instructions, this court cannot assume

-18-

that the jury found the facts necessary to sustain a conviction under *Pinkerton*.") (Clay, J., dissenting).

However, the jury was instructed appropriately on aiding and abetting with respect to the firearm counts. "In order to sustain a conviction of aiding and abetting the use of a firearm during and in relation to a [drug trafficking crime] under 18 U.S.C. § 924(c), the government must prove that 'the defendant both associated and participated in the use of the firearm in connection with the underlying crime.'" *United States v. Robinson*, 389 F.3d 582, 591 (6th Cir. 2004) (quoting *United States v. Morrow*, 977 F.2d 222, 231 (6th Cir. 1992)). Demonstrating actual possession or use of the firearm is not necessary; nor must the government "prove that the defendant performed some act that directly facilitated or encouraged the use of a firearm." *United States v. Velez*, 485 F. App'x 793, 796 (6th Cir. 2012). However, the government must prove that the defendant "knew one of his accomplices possessed a gun in furtherance of a drug trafficking offense and that [the defendant] acted with the intent to assist or influence the commission of the underlying drug trafficking crime." *United States v. Gardner*, 488 F.3d 700, 712 (6th Cir. 2007); *see also United States v. McNeil*, 106 F. App'x 294, 300 (6th Cir. 2004) (discussing accomplice liability for brandishing during and in relation to a crime of violence). "The government must show that the defendant was an active participant in the crime and that the crime would not have occurred in his absence." *McNeil*, 106 F. App'x at 300.

The government's charge of brandishing during a drug trafficking crime arises from using the firearms listed in the indictment to rob Freeman. There was sufficient evidence to demonstrate that Respardo-Ramirez knew that his accomplices would be armed. *See Rattigan v. United States*, 151 F.3d 551, 558 (6th Cir. 1998). Bravo-Garcia testified that Anthony Ramirez, Espinoza, and

-19-

Santana were carrying the firearms listed in the indictment when they met Soto and Respardo-Ramirez at the garage where Jose Enriquez-Enriquez and the unknown victim were being held. In addition, Respardo-Ramirez himself was armed, suggesting knowledge that he and his co-defendants were in possession of and willing to use firearms to further their drug trafficking crime. The government also presented evidence that Respardo-Ramirez was an active participant in the drug trafficking crime. Both Bravo-Garcia and Gudino testified that when the group traveled to Detroit for a second time to rob Freeman, Respardo-Ramirez remained behind to guard the unknown victim. Viewing the evidence in the light most favorable to the prosecution, a reasonable jury could conclude that Respardo-Ramirez "knew that the principal[s were] armed and act[ed] with the intent to assist or influence the commission of the underlying predicate crime." *Ibid.*; *see also United States v. Robinson*, 389 F.3d 582, 591 (6th Cir. 2004) (finding that a defendant aided and abetted in brandishing a weapon during a robbery where his co-defendants brandished weapons, the defendant drove them to the bank and allowed them to use his car as a getaway car, and the defendant shared in the proceeds of the robbery).

One countervailing piece of evidence is Bravo-Garcia's statement that defendant Respardo-Ramirez was not involved in the planning "about what was to occur in Detroit." Trial Tr., May 1, 2013 at 65. But the jury could reasonably have concluded that the testimony referred to planning the first trip to Detroit; that doubt is reflected in their acquittal of the defendant on the charge of conspiracy to kidnap. In addition, to be liable as an accomplice, it is not necessary that the government prove that the defendant was involved in planning the offense. It is sufficient that the government demonstrate that the defendant knew that a gun would be used and acted with intent to

-20-

aid in the commission of the underlying crime.  The government presented sufficient evidence from which a reasonable jury could find those facts.

### E.  Count VIII: Brandishing Firearm During a Crime of Violence

Defendants Santana and Espinoza argue that because the evidence was insufficient to establish their guilt on the kidnapping and conspiracy to kidnap counts, there was insufficient evidence to establish that they brandished a firearm during and in relation to those crimes.  Because the evidence was sufficient to support a verdict on the kidnapping counts, that argument fails.  In addition, Santana argues that Gudino's testimony was equivocal as to whether he was carrying or using a gun during the kidnapping.  The evidence was sufficient to establish that Santana and Espinoza brandished firearms during and in relation to the kidnapping offenses.  Both Gudino and Bravo-Garcia testified that Santana and Espinoza confronted Enriquez-Enriquez with guns and forced him and another unidentified individual into the minivan.  In addition, Bravo-Garcia testified that the guns used during the robbery of Freeman were the same guns that had been used during the kidnapping; those guns were later seized by law enforcement and described in the indictment.  Santana's argument that Gudino's testimony was equivocal is insufficient to require either a judgment of acquittal or a new trial.  The argument turns on the following exchange:

> Q. Did someone else have a gun?
> A.  Yes.
> Q.  Who else?
> A.  I believe it was Mr. Santana.  Mr. Santana. . . .
> Q.  So you believe Mr. Santana had a gun?
> A.  Yes.
> Q.  And why is it that you believe so?
> A.  Because that's what I remember seeing.
> Q.  Okay.
> A.  Maybe I just worded it wrong.  Sorry.

Gudino at 199.  That passage casts no doubt on Gudino's otherwise unequivocal testimony that Santana was carrying a gun and pointed the gun at Jose Enriquez-Enriquez's face.  *See* Gudino at 196, 199-200.  The defendants' convictions on this count will stand.

Respardo-Ramirez advances the same arguments on count VIII as he did on count VII, and the government's response also is the same.  As discussed above, the government's constructive possession and *Pinkerton* arguments fail.  Therefore, the only question is whether Respardo-Ramirez properly was convicting of aiding and abetting brandishing a firearm during a crime of violence.  The government's charge of brandishing during a crime of violence arises from the use the firearms listed in the indictment to kidnap Jose Enriquez-Enriquez.  But the government has presented no evidence demonstrating that Respardo-Ramirez knew of the kidnapping plan prior to its occurrence or that Respardo-Ramirez had any knowledge that any of his co-defendants would brandish the firearms charged in the indictment during the kidnapping.  The jury's doubt as to Respardo-Ramirez's prior knowledge of the kidnapping is reflected by his acquittal of conspiracy to kidnap.  Because there was no evidence presented that Respardo-Ramirez knew of the kidnapping, the government did not prove that he knew that any of his accomplices were armed prior to defendant Respardo-Ramirez's arrival at the garage.  *See Gardner*, 488 F.3d at 712.

However, Bravo-Garcia testified that when Respardo-Ramirez was present in the garage, Anthony Ramirez, Santana, and Espinoza were carrying the guns used in the kidnapping "in their waist."  Trial Tr., Apr. 30, 2013 at 85.  Brandishing requires that the defendant "display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person."  18 U.S.C. § 924(c)(4).  The Court has found no case in which having a gun in the waistband of one's pants was

found to constitute brandishing in the absence of any additional conduct. *See United States v. Thompson*, 560 F.3d 745, 749 (8th Cir. 2009) (finding that a jury could find brandishing where the defendant "displayed the revolver on the engine block of his car while arranging the drug transaction, moved the revolved from the engine block to the waistband of his pants . . . , and carried the revolver in his waistband . . . while delivering the crack cocaine"); *United States v. Dobbins*, 165 F.3d 29, *6 (6th Cir. 1998) (finding that a defendant used, but did not brandish, a firearm under armed robbery statute where defendant had a gun in his back pocket). Nor has the government offered any evidence as to the defendants' intent in carrying the firearms while in the garage and while the victims already were tied up. Therefore, Respardo-Ramirez is entitled to a judgment of acquittal on count VIII of the indictment.

### F.  Defendant Soto's Ineffective Assistance Argument

Defendant Soto argues that he is entitled to a new trial because his previous trial counsel were ineffective by failing to mount Fourth Amendment challenges to four searches and seizures. Normally, claims of ineffective assistance of counsel are not raised until direct appeals are exhausted, and then via 28 U.S.C. § 2255. They are not typically addressed in a motion for new trial under Federal Rule of Criminal Procedure 33. Although the "paradigmatic use of a Rule 33 motion is to seek a new trial on the ground that the jury's verdict was against the manifest weight of the evidence . . . it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (internal quotations and alterations omitted). The Sixth Circuit has held that a violation of the right to the effective assistance of counsel "clearly meets this standard." *Ibid*. (collecting cases). The Sixth Circuit has noted that although "as a general matter, ineffective assistance of

-23-

counsel claims are best raised on habeas, this is only because in the mine run of cases, the record on counsel's allegedly deficient performance is not fully developed before that point." *Id*. at 374 n.10 (internal quotation omitted). The *Munoz* court noted that reviewing the ineffective-assistance-of-counsel claim under Rule 33 was appropriate because the district court has developed the record at an evidentiary hearing. *Ibid.*

Soto's new attorneys have asked for an evidentiary hearing. There are a couple of issues that might benefit from one. The first is whether Soto's first lawyers performed within acceptable professional norms when they failed to file suppression motions. The decision not to do so might have been a strategic one, although it is difficult to fathom a reason for not challenging the searches in this case. The Court has little trouble concluding that previous counsel's performance was deficient as a result of the failure to challenge the searches. *See Stadler v. Curtin*, 682 F. Supp. 2d 807, 826 (E.D. Mich. 2010) (noting that "'strategic' choices by counsel, such as the failure to object to obviously tainted and inadmissible evidence, and the failure to cross-examine a key prosecution witness, have been found to be so unsound as to negate the finding that counsel's performance tracked 'prevailing professional norms'" (internal citations omitted)). No evidentiary hearing is necessary on that point.

Another point that might be developed at an evidentiary hearing is the question whether Soto's girlfriend consented to a warrantless search of certain premises, as discussed below. However, Soto has not offered any basis, such as an affidavit from his girlfriend, that suggests facts that could be developed at an evidentiary hearing. Soto's attorneys filed a brief with this Court on June 23, 2013 — seven weeks ago — that asserts that "time constraints" did not allow them to secure an affidavit from the girlfriend. But this case has been pending for several months, and the

-24-

trial occurred last spring. Even with substitution of new counsel, there has been sufficient time to obtain an affidavit, if one would be forthcoming. It is the defendant's burden to establish a right to a new trial. *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995) (citing *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994)). Courts "require a defendant to produce at least a modicum of evidence in support of a request for an evidentiary hearing on a motion for a new trial based on ineffective assistance of counsel." *United States v. Allen*, 254 F. App'x 475, 478 (6th Cir. 2007) (citing *United States v. Bass*, 460 F.3d 830, 838 (6th Cir 2006)). The Court does not believe that an evidentiary hearing is necessary to adjudicate Soto's motion for new trial as presented.

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Valentine v. United States*, 488 F.3d 325, 331 (6th Cir. 2007). To show a violation of the Sixth Amendment right to effective assistance of counsel, a defendant must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688) (internal quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless the defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

Soto argues that his lawyers should have filed motions to suppress evidence obtain via search warrants from three locations in Chicago, Illinois — 9201 Sawyer Avenue, 4309 West 77th Place, and 5318 Mozart — and a warrantless search at 5038 South Ridgeway. As mentioned above, the Court finds that for the purpose of the present motion, the failure to do so amounted to deficient performance. However, in addition to showing deficient performance, where a defendant's ineffective assistance of counsel claim is premised on "defense counsel's failure to litigate a Fourth Amendment claim competently . . . the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).

### 1. Search of 9201 Sawyer Avenue

The evidence seized from 9201 Sawyer Avenue was not admitted at trial, so Soto can demonstrate no prejudice as to the failure to challenge the search at that location. The Court notes that some of those items, consisting of empty kilogram wrappers, debit cards, and body armor, were marked as exhibits, but they were not offered or received at trial. Soto's motion, therefore, stands

or falls on the validity of the other three searches and the potential prejudice flowing from evidence that should not have been admitted.

### 2.  Warrantless search of 5038 South Ridgeway

The warrantless search of 5038 South Ridgeway ostensibly was based on the consent of Fabiola Xiomara Garcia, who was identified as Soto's girlfriend.  The investigator's report of that search states that after searching 4309 West 77th Street, officers learned that Soto was in the process of moving to 5038 South Ridgeway.  Upon arriving at that address, officer approached Garcia, who signed a form consenting to the search of the residence.

A warrantless search is reasonable under the Fourth Amendment where the search is conducted with proper consent voluntarily obtained.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 221 (1973).  The government bears the burden of demonstrating that consent was "freely and voluntarily given," without influence of duress, coercion, or mere submission to authority.  *United States v. Van Shutters*, 163 F.3d 331, 335 (6th Cir. 1998).  That burden must be met with "clear and positive testimony."  *United States v. Hurst*, 228 F.3d 751, 757 (6th Cir. 2000).  However, the government need not prove that it was the defendant who gave consent to search.  "A search does not violate the Fourth Amendment where police obtain consent to search from one who possesses common authority over the premises."  *United States v. Clutter*, 914 F.2d 775, 777 (6th Cir. 1990); *Van Shutters*, 163 F.3d at 335.  The Court determines the validity of consent by evaluating the totality of circumstances surrounding the alleged consent given.  *Ibid*.

There is no credible evidence that contradicts the police report and the written consent form or otherwise suggests Garcia did not consent to the search of 5038 Ridgeway.  Soto has not argued that Garcia lacked authority to consent to the search.  He has stated only that Garcia has spoken to

-27-

his lawyer and stated that she did not give free and voluntary consent to the search.  That lone assertion is insufficient to demonstrate that the defendant's Fourth Amendment challenge would have been successful.  *See Kimmelman*, 477 U.S. at 375.  The allegation in Soto's motion is insufficient to entitle him to a new trial.

### 3. Search warrants

Defendant Soto also challenges two searches that were conducted under search warrants.  A search warrant, to be valid,  must be issued by a neutral and detached magistrate upon a finding of probable cause and must describe with particularity the place to be searched and the items to be seized.  *United States v. Beals*, 698 F.3d 248, 264 (6th Cir. 2012).   On the continuum between ignorance and certainty, "[p]robable cause arises if there are 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'"  *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)).  The test for probable cause calls for an assessment of whether there is "a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place."  *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (quoting *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)).  A magistrate properly reaches that conclusion when the warrant affidavit sets forth sufficient facts that provide a "'substantial basis' for concluding that 'a search would uncover evidence of wrongdoing.'"  *United States v. Sonagere*, 30 F.3d 51, 53 (6th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).  As the Supreme Court recently has reiterated, "the test for probable cause is not reducible to 'precise definition or quantification.'"  *United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013) (quoting *Florida v. Harris*, --- U.S. ----, 133 S. Ct. 1050, 1055 (2013)).  Instead, the court must apply a "practical and common-sens[e]

standard" and take a "flexible, all-things-considered approach" to determine whether probable cause existed.  *Harris*, --- U.S. at ----, 133 S. Ct. at 1055.

When the facts supporting a finding of probable cause come from a hearsay source, the magistrate must have some basis to assess the reliability of the declarant.  The precedents do not prescribe any specific formula by which reliability is to be gauged, *United States v. Allen*, 211 F.3d 970, 975-76 (6th Cir. 2000); as a general rule, however, the decisions have required either independent corroboration by law enforcement officials or some showing that the informant is otherwise reliable, such as a history of furnishing information that turned out to be accurate.  *See United States v. Helton*, 314 F.3d 812, 819 (6th Cir. 2003) (noting that "a court must consider the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances for evaluating the impact of that information"); *United States v. Smith*, 182 F.3d 473, 483 (6th Cir. 1999) (stating that "if the prior track record of an informant adequately substantiates his credibility, other indicia of reliability are not necessarily required"); *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005) (observing that "in the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration").

a.  Search warrant for 4309 West 77th Place

In this case, both search warrants were based on information provided by anonymous informants.  The search warrant affidavit for 4309 West 77th Place states that the affiant spoke with an anonymous individual who stated that while he was at that address, Soto showed him a sawed-off shotgun.  Def. Soto's Mot. Ex. 1.  According to the affidavit, Soto told the anonymous individual that he kept the gun for protection because the Latin Kings, of which Soto allegedly was a member, was "at war" with another gang.  *Ibid*.  The anonymous individual stated that he had known Soto

-29-

for two years and that Soto owned a tan Chevrolet Trailblazer with license plate number H933100; when the affiant and the anonymous individual drove past 4309 West 77th Place, the individual identified the vehicle in the driveway.   *Ibid*.   The affidavit contains no indication that the anonymous individual was reliable; for example, the affidavit does not state that the informant had provided reliable information in the past.  *But see United States v. Dyer*, 580 F.3d 386, 391-92 (6th Cir. 2009) (finding an informant's reliability established where the informant was known to officers and stated that he had witnessed a drug transaction but also finding that the informant's statement was corroborated by independent police investigation).  The only independent corroboration of the individual's story is the fact that the individual correctly identified a car that was later observed at the address.  The Sixth Circuit has held that merely confirming that an individual lives at a given address is insufficient corroboration to support a finding of probable cause because "these details do not tend to bolster the tip" that the defendant was engaged in illegal activity at that address. *United States v. Hoang*, 487 F. App'x 239, 244 (6th Cir. 2012) (citing *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009)).  Soto relies heavily on *United States v. Higgins*, in which the court found invalid a search warrant based on an affidavit in which the affiant did not attest to an unnamed informant's reliability.  *Higgins*, 557 F.3d at 389-90.

The government argues that the comparison to *Higgins* is inapposite, because in this case, unlike in *Higgins*, the anonymous individual stated that he had been inside defendant Soto's apartment and had seen evidence there in the form of a sawn-off shotgun.  *See Higgins*, 557 F.3d at 390.  The *Higgins* court found it important that the informant did not allege that he had been inside the defendant's apartment or seen any evidence of a crime there; however, the court considered those factors on the separate question of whether the affidavit established a nexus

-30-

between the place to be searched and the items to be seized.  *Ibid*. (citing *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)).  It did not apply those facts to the question whether the informant was reliable.  The *Higgins* court, therefore, found both a lack of corroboration and an insufficient nexus.  Although here the informant's statement that he had been inside the apartment and seen the shotgun establishes a nexus between the place to be searched and the item to be seized, it does nothing to demonstrate the informant's reliability and does not constitute independent police corroboration.  And in another respect, the affidavit in this case is weaker than the affidavit found wanting in *Higgins*: in *Higgins*, the informant's statement was confirmed by other passengers in the informant's care, whereas here, no other individual corroborated the informant's statements.  Because the warrant affidavit for 4309 West 77th Street relies entirely on an uncorroborated statement from an informant who has not been shown to be reliable, it was not supported by probable cause.

### b.  Search warrant for 5318 Mozart

The warrant for the search of 5318 Mozart presents a closer question.  The warrant affidavit states that an anonymous informant told the affiant that Soto sold cocaine from the address.  Def.'s Mot. Ex. 2.  The informant stated that he had gone to the house and purchased an  "eight ball" of cocaine from Soto and that he had been purchasing cocaine from Soto for at least two months.  The informant identified a photograph of Soto and, after being taken to 5318 Mozart, identified the building as the place where he had purchased cocaine.  The informant was made available to the magistrate judge for questioning.

As with the first warrant, the affidavit contains no indication that the informant was reliable.  Moreover, the police corroboration was limited to innocent facts: the informant was able to identify

the address and a photograph of defendant Soto. Two factors, however, differentiate the second

warrant from the first and make the probable cause question a closer one. Unlike the informant in

the first warrant, the informant in the second warrant implicated himself in criminal activity in

making his statement. In addition, the informant in the second warrant was made known to the

magistrate judge and was made available for questioning. However, the Sixth Circuit has held that

"the fact that the informant was known to the affiant and issuing magistrate and admitted a crime

does not alone provide probable cause." *Higgins*, 557 F.3d at 390. Although the second warrant

presents a much closer question, it also was lacking in probable cause.

### c. "Good faith" exception

When a warrant is not supported by probable cause, the evidence obtained need not be

suppressed *if* it was "'seized in reasonable, good-faith reliance on a search warrant that is

subsequently held to be defective.'" *United States v. Hython*, 443 F.3d 480, 484 (6th Cir. 2006)

(quoting *United States v. Leon*, 468 U.S. 897, 905 (1984)). "'[T]he relevant question is whether the

officer reasonably believed that the warrant was properly issued, *not* whether probable cause existed

in fact.'" *Id.* at 487 (quoting *United States v. Laughton*, 409 F.3d 744, 752 (6th Cir. 2005) (emphasis

in original)). The good faith exception does not apply in four situations:

> (1) where the issuing magistrate was misled by information in an affidavit that the
> affiant knew was false or would have known was false except for his reckless
> disregard for the truth; (2) where the issuing magistrate wholly abandoned his
> judicial role and failed to act in a neutral and detached fashion, serving merely as a
> rubber stamp for the police; (3) where the affidavit was nothing more than a "bare
> bones" affidavit that did not provide the magistrate with a substantial basis for
> determining the existence of probable cause, or where the affidavit was so lacking
> in indicia of probable cause as to render official belief in its existence entirely
> unreasonable; and (4) where the officer's reliance on the warrant was not in good
> faith or objectively reasonable, such as where the warrant is facially deficient.

*Id.* at 484 (citing *Leon*, 468 U.S. at 923).

-32-

Pointing to the third exception, Soto argues that the searches cannot be saved by the good faith exception because the affidavits were so devoid of indicia of probable cause that a belief in their validity was unreasonable.  "In determining whether an affidavit is 'bare bones,' the reviewing court is concerned exclusively with the statements contained within the warrant itself."  *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996).  The affidavit must reflect the facts of the situation at hand, and "[t]he use of generalized boilerplate recitations designed to meet all law enforcement needs for illustrating certain types of criminal conduct engenders the risk that insufficient particularized facts about the case or suspect will be present for a magistrate to determine probable cause."  *Ibid.* (internal quotation omitted).

Soto compares this case to *Weaver*, in which the Sixth Circuit found that an affidavit was so lacking in probable cause that belief in its existence was entirely unreasonable.  In *Weaver*, the affidavit was "based almost entirely on hearsay information supplied by a previously reliable confidential informant" and was largely comprised of boilerplate.  *Id.* at 1377. The Sixth Circuit found that the affidavit was "bare bones" because the officer engaged in no independent investigation to corroborate the tip and that the officer's reliance on the search warrant without that independent investigation was unreasonable.  *Id.* at 1379-80.  The court found relevant that the affiant did not describe the contraband or how it was maintained, identify aspects of the location in the residence where the contraband was seen or kept, include a description of the individual targeted in the search, or provide information on the drug distribution operation.  *Id.* at 1378 n.4.  The Sixth Circuit, sitting *en banc*, has limited *Weaver* to its facts.  *United States v. Allen*, 211 F.3d 970, 974 (6th Cir. 2000) (en banc).

The search warrant for 5318 South Mozart was not so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. The affidavit does not rely on boilerplate language concerning the officer's "experience in law enforcement [or] the traditional behavior of drug dealers." *United States v. Moore*, 661 F.3d 309, 311 (6th Cir. 2011). Instead, the search warrant, unlike the warrant in *Weaver*, contains information that implicates the informant in criminal activity, a positive identification of Soto by the informant, and a statement that Soto had retrieved a bag filled with cocaine from the rear of the residence. The informant's statements connected the drug trafficking to 5318 South Mozart. The search warrant for that address qualifies for the good faith exception to the exculsionary rule.

The search warrant for 4309 West 77th Street presents a closer question. The strikes against the affidavit are serious: there is no indication that the informant was reliable, the corroboration was scant and related to innocent details, the informant's name was not disclosed to the magistrate, and the informant did not expose himself to criminal liability, which would have bolstered his credibility. However, the warrant clears the bar — barely — and the officer's reliance on it was not "entirely unreasonable." *Hython*, 443 F.3d at 484.

Comparison to other cases in which the good faith exception has been applied is instructive. In *United States v. McCraven*, 401 F.3d 693 (6th Cir. 2005), the Sixth Circuit found that the good faith exception applied where the affidavit stated only that an unnamed informant had provided correct information in the past and had been inside the target residence and observed the defendant storing and selling cocaine and marijuana. *Id*. at 695, 698. The court noted that there were few facts from which the issuing judge could have determined the reliability of the informant, but that "the law-enforcement version of the hypothetical 'reasonable person' . . . would not necessarily have

-34-

known that the affidavit supporting the warrant at issue here was insufficient, if in fact it was insufficient." *Id*. at 698. Here, although the affidavit does not contain a statement that the informant was reliable, the information provided by the informant was far more detailed than in *McCraven*. The informant described the sawed-off shotgun, stated that Soto kept it under his bed, and explained Soto's reasons for possessing the shotgun. Def.'s Mot. Ex. 1. That information is far more specific than the general allegation that a defendant has been selling drugs at a residence.

In *Higgins*, the case upon which Soto's probable cause argument is based, the court found that the good faith exception applied despite the deficiencies in the warrant affidavit. *Higgins*, 557 F.3d at 391. And although the affidavit in this case is in some respects weaker than that in *Higgins*, in at least one respect it is stronger: it demonstrates a clear nexus between the place to be searched and the items to be seized, because the informant stated that he had seen the sawed-off shotgun in Soto's bedroom. *See also Weaver*, 99 F.3d at 1378 n.4 (finding a lack of particularized facts as to the description or location of the contraband significant to finding a lack of probable cause).

Finally, the Sixth Circuit has held that "[t]he statements of an informant . . . , whose identity was known to the police and who would be subject to prosecution for making a false report, are . . . entitled to far greater weight than those of an anonymous source." *United States v. May*, 399 F.3d 817, 824-25 (6th Cir. 2005). Here, although the identity of the informant was not known to the magistrate judge, he was known to the police. Because the informant's statement contained specific facts as to the location, description, and purpose of the contraband, the informant was known to the police, and the affidavit established a clear nexus between the place to be searched and the item to be seized, the Court concludes that the warrant qualifies for the good faith exception.

* * * * * * * * *

-35-

The Court finds that although there was ample reason for Soto's first lawyers to file motions challenging the various searches, those motions ultimately would not have been successful, and the evidence seized would not have been suppressed at trial.  Therefore, Soto cannot establish the prejudice required to prevail on an ineffective-assistance-of-counsel claim.  *Kimmelman*, 477 U.S. at 375 .

<div align="center">III.</div>

There is sufficient evidence to support the convictions of the defendants, except the conviction of defendant Juan Respardo-Ramirez of the crime charged in count VIII.  There is no basis to grant any of the defendants a new trial.

Accordingly, it is **ORDERED** that the motions for judgment of acquittal or new trial by defendants Hector Santana, Manuel Antonio Soto, and Christopher Espinoza [dkt. #468, 469, 476] are **DENIED**.

It is further **ORDERED** that the motion for judgment of acquittal or new trial by defendant Juan Respardo-Ramirez [dkt. #482] is   **GRANTED IN PART AND DENIED IN PART**. Defendant Juan Respardo-Ramirez is hereby **ACQUITTED** of the charge in Count VIII of the fourth superseding indictment, and that count is **DISMISSED WITH PREJUDICE** against defendant Juan Respardo-Ramirez, **only**.

<div style="margin-left:45%;">
s/David M. Lawson                 <br>
DAVID M. LAWSON<br>
United States District Judge
</div>

Dated:  August 12, 2013

<div align="center">-36-</div>

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 12, 2013.

s/Shawntel Jackson
SHAWNTEL JACKSON