UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                        Plaintiff,                             Case Number 10-20635

v.                                                Honorable David M. Lawson

HECTOR SANTANA,

                        Defendant.

_____/

## ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE

Defendant Hector Santana has filed a motion asking the Court to reduce his sentence to time served under the authority of the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239. Santana has served almost ten years of a 17-year sentence for drug, kidnapping, and firearm offenses. He has exhausted his administrative remedies. He argues that a sentence reduction is justified by his age (60) and medical conditions coupled with the threat of infection with the novel coronavirus in the congregant confinement of a prison setting. The government contends that Santana has not shown extraordinary and compelling reasons for release, and it maintains that he would be a threat to public safety if set free. Santana, however, has contracted COVID-19 and suffered severe complications that required hospitalization, and he still exhibits lingering signs of the infection's complications. His comorbidities remain and include obesity, type 2 diabetes, and hypertension. His conduct in prison has been exemplary. He was a lawful permanent resident when he committed his crimes, and he almost certainly will be deported to Mexico upon release. He will not pose a threat to the community when released. The factors in 18 U.S.C. § 3553(a) do not preclude early release. The motion will be granted.

I.

Hector Santana was charged with crimes relating to a Chicago-based drug trafficking organization that sold cocaine to distributors in Detroit.  Manuel Antonio Soto was the leader of the organization.  When one of Soto's middlemen in Michigan did not pay for a cocaine shipment, Soto involved Santana in his plan to collect the funds.  Soto sent Santana and others to Michigan either to find the money or kidnap the middleman and bring him back to Chicago.  Santana eventually was arrested and charged with conspiracy, kidnapping, drug, and firearm offenses.  The jury convicted him of all charges.

On October 3, 2013, the Court sentenced Santana to 42 years in prison.  The sentence was driven mostly by the mandatory minimum and consecutive sentences required by several counts of conviction.   After one of the firearm counts became legally unsustainable because of intervening changes in the law, the Court vacated the sentence on that count and resentenced Santana to a 17-year prison term, again reflecting the mandatory minimum terms required on the remaining counts of conviction.

Santana, who was detained pending trial, began serving his sentence on February 10, 2014 and is scheduled to be released in approximately 2031.  He is presently confined by the Bureau of Prisons (BOP) at FCI Hazelton, a medium-security facility in West Virginia that houses about 1,900 inmates.

Santana is 60 years old and suffers from obesity (BMI 30.2), type 2 diabetes, hypertension, vitamin D deficiency, and high cholesterol.  Additionally, Santana tested positive for COVID-19 on December 22, 2020, experienced symptoms, and developed severe complications.  In December 2020, he presented with a cough, body aches, shortness of breath, and an alarmingly low oxygen saturation level of 70%.  He was rushed to a hospital where he was diagnosed with respiratory

- 2 -

failure.  He was placed in the intensive care unit and provided with supplemental oxygen.  He was prescribed Remdesivir and began showing signs of improvement in early January 2021.  He was transferred to a different hospital on January 6 to wean him off oxygen and was discharged on January 15, 2021.   However, he was sent back to the hospital on January 22 "due to covid complications."   Santana returned to prison on January 25 after his symptoms abated, but his recovery has been slow.  He exhibited "continued covid inflammation" in early February.  The BOP deemed his case "resolved" on February 5, 2021; however, as of March 8, 2021, Santana continued to complain about shortness of breath and chest pain.

On February 17, 2021, Santana submitted a request for compassionate release to the Warden at FCI Hazelton but received no response.  He then filed a *pro se* motion for compassionate release in this Court.  Counsel was appointed, who filed a robust brief in reply to the government's answer to the motion.

The most recent data disclosed by the BOP indicates that there is one active coronavirus case among inmates at FCI Hazelton, and one among staff.  In addition, 139 inmates and 77 staff members previously were diagnosed and now have recovered.  One inmate has died from the virus.  Santana received his first dose of the Pfizer vaccine on March 10, 2021.

II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'"  *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)).  "But that rule comes with a few exceptions, one of which permits compassionate release."  *Ibid.*  "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A).  Or it may come through a motion filed by the inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of

Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). Santana relies on subparagraph (i) of the statute. Under that provision, the Court can order a reduction of a sentence, even to time served, by following a procedure that the court of appeals has distilled into three steps. *First*, consider whether "extraordinary and compelling reasons warrant such a reduction." *Second*, determine if the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Third*, "consider[] the factors set forth in section 3553(a) to the extent that they are applicable." *United States v. Ruffin*, 978 F.3d 1000, 1004-06 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)(1)(A)).

The Sentencing Commission's policy statement to be considered under step two is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317 (6th Cir. 2019) (*en banc*) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it"). That has led the court of appeals in its evolving guidance on the subject to hold that district courts should dispense with step two when the motion for compassionate release comes from a prisoner and not the BOP. *United States v. Jones*, 980 F.3d 1098, 1109 (6th Cir. 2020) ("We now join the majority of district courts and the Second Circuit in holding that the passage of the First Step Act rendered

- 4 -

§ 1B1.13 'inapplicable' to cases where an imprisoned person files a motion for compassionate release.") (citing *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020)).

More recently, the court of appeals took the explanation a step further.  In *United States v. Elias*, 984 F.3d 516 (6th Cir. 2021), the court ascribed Congress's amendment of section 3582(c)(1) to the BOP's "rare[]" exercise of its power to move for sentence reductions, that "the program was plagued by mismanagement," and that "the BOP 'ha[d] no timeliness standards for reviewing . . . requests.'"  984 F.3d at 518 (quoting *United States v. Brooker*, 976 F.3d 228, 231-32 (2d Cir. 2020)).  It reaffirmed *Jones*'s holding "that § 1B1.13 is not an applicable policy statement for compassionate-release motions brought directly by inmates, and so district courts need not consider it when ruling on those motions." *Id.* at 519-20.  It then held that "in the absence of an applicable policy statement for inmate-filed compassionate-release motions, district courts have discretion to define 'extraordinary and compelling' on their own initiative." *Ibid.*  However, the defendant still must satisfy the other two requirements, and his "failure to meet any one of those criteria" will result in the denial of his motion. *United States v. Tomes*, 990 F.3d 500, 502 (6th Cir. 2021).

## A.

The government concedes that the request for release has been properly exhausted, so that threshold requirement for relief has been satisfied.

## B.

Addressing the first element — extraordinary and compelling reasons — Santana argues that his pre-existing medical conditions consisting of hypertension, obesity (BMI on 30.2), and type 2 diabetes complicated his recovery and render him vulnerable to complications from possible reinfection by the highly-contagious novel coronavirus.  In *Jones*, the court of appeals noted that

- 5 -

a prisoner may establish "extraordinary and compelling reasons" warranting early release either where he "has COVID-19 (because [the inmate] may suffer from serious long-term health problems and potentially may require treatment that he cannot receive [while in custody]), or where he does *not* have COVID-19 (because [other] medical issues put him at risk of contracting the virus)." *Jones*, 980 F.3d at 1102 n.6.  Santana has established the former.

The defendant is justifiably concerned about the health risks posed by his incarceration. "The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise.  If contracted, COVID-19 can cause severe complications and death. . . . [T]he Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing." *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020).  "The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation.  It presents a clear and present danger to free society for reasons that need no elaboration." *United States v. Ortiz*, No. 16-439, 2020 WL 3640582, at *2 (S.D.N.Y. July 6, 2020).

Moreover, "the crowded nature of federal detention centers presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread.  And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself.  For these reasons, in the past months, numerous [federal] courts . . . have ordered the temporary release of inmates held in pretrial or presentencing custody and, in more limited instances, the compassionate release of high-risk inmates serving federal sentences." *Ortiz*, 2020 WL 3640582, at *2 (collecting cases; footnotes omitted).

It is widely recognized and publicly acknowledged that persons with certain personal characteristics face an increased risk of severe consequences from potential COVID-19 infection. *United States v. Lassister*, No. 17-232, 2020 WL 3639988, at *4 (D. Md. July 6, 2020) ("The risk factors include age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.") (citing Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness, Centers for Disease Control & Prevention (June 25, 2020), https://bit.ly/2WBcB16).

The pandemic guidelines published by the CDC, which regularly have been updated over the past year with the benefit of ongoing research about the COVID-19 disease, recognize that obesity and type are factors that seriously elevate the risk of complications for anyone who is infected with the COVID-19 disease. *See People with Certain Medical Conditions*, Ctrs. for Disease Control and Prevention (May 13, 2021) https://bit.ly/3vlpWcH.

Another pertinent consideration is the probability that the defendant is likely to contract an infection again from the coronavirus in his present situation, which in this case appears to be possible. Recent reports indicate that the probability of infection at Hazelton is lower than it once was. However, that is little comfort to the defendant who continues to experience the lingering effects of the virus with diminished opportunities to care for himself. And although it is true that the likelihood of a severe outbreak further will diminish as the BOP's vaccination program proceeds, there is no guarantee that the defendant will not fall victim to a variant in his weakened condition.

The defendant suffered from a severe infection, which required hospitalization and supplemental oxygen. The circumstances here are similar to the instances where inmates have been released after contracting and recovering from the coronavirus because they had suffered

grave symptoms and required extensive therapies, which aggravated rather than mitigated the assessment of their prospective risk in case of a reinfection. *See, e.g.*, *United States v. Brownlee*, No. 14-20562, 2020 WL 6118549, at *6 (E.D. Mich. Oct. 16, 2020) ("Because she has at least two recognized serious medical risk factors, has no guarantee of any prospective immunity, and was hospitalized with grave symptoms and required extensive treatment to counter her previous infection, and because there continue to be active cases at the facility where she is confined, the defendant has established that she faces an extraordinary and compelling medical risk due to possible reinfection.").

Santana has established extraordinary and compelling reasons for the relief he seeks under 18 U.S.C. 3582(c)(1)(A)(i).

C.

Although the defendant has made a satisfactory showing of extraordinary and compelling medical risk, the Court must also consider the relevant factors listed in 18 U.S.C. § 3553(a).

There is no requirement that the prisoner must establish a lack of dangerousness, as is the case for compassionate release applications made by the BOP. *See* U.S.S.G. § 1B1.13; *Jones*, 980 F.3d at 1109 ("Until the Sentencing Commission updates § 1B1.13 to reflect the First Step Act, district courts have full discretion in the interim to determine whether an 'extraordinary and compelling' reason justifies compassionate release when an imprisoned person files a § 3582(c)(1)(A) motion."); *Elias*, 984 F.3d at 519-20 (same).

That is not to say that dangerousness is irrelevant. It is a factor incorporated in section 3553(a), which must be "consider[ed]" before release for extraordinary and compelling reasons may be allowed. *See* 18 U.S.C. § 3553(a)(2)(C) (requiring a sentencing court to consider "the need . . . to protect the public from further crimes of the defendant"). And any sentence reduction

- 8 -

also must account for "the seriousness of the offense," the need "to promote respect for the law," and "afford adequate deterrence to criminal conduct." *Id.* § (2)(A), (C). These factors are to be considered together with the prisoner's circumstances to arrive at a conclusion that they are sufficiently extraordinary and compelling to justify a sentence reduction.

Moreover, the Court's "initial balancing of the § 3553(a) factors during [the defendant's] sentencing" is presumed "to remain [] an accurate assessment as to whether those factors justify a sentence reduction." *United States v. Sherwood*, 986 F.3d 951, 954 (6th Cir. 2021). The defendant, therefore, must "make a compelling case as to why the court's § 3553(a) analysis would be different if conducted today." *Ibid.*

Santana's crime was serious, and he has accounted for it over the last nine years. As noted at the sentencing and resentencing proceedings, Santana's criminal history was overstated. It consists mainly of drinking and driving offenses in his early to mid-forties. His convictions appear to be the result of alcohol abuse, which likely has been mitigated by his successful programing and years of sobriety while in custody.

Santana is 60 years old and a citizen of Mexico. Although he was legally in the United States, his present convictions likely will result in his removal from the country. He has been in Bureau of Prison custody since September 9, 2013, and his disciplinary record is excellent. He regularly was employed in the prison commissary before the pandemic handling inventory and processing orders. The BOP staff reports that Santana maintained a good work record. He has received no disciplinary reports. And the BOP has determined Santana is at a Low Risk of Recidivism Level. That assessment corresponds with empirical evidence from the United States Sentencing Commission, which has recognized that the rate of recidivism overall drops significantly with age. It is well accepted that "evidence of post sentencing rehabilitation may

plainly be relevant to 'the history and characteristics of the defendant.'" *Pepper v. United States*, 562 U.S. 476, 491 (2011). "Several courts have . . . considered a defendant's rehabilitation in granting compassionate release." *United States v. Parker*, No. 98-00749, 2020 WL 2572525, at *11 (C.D. Cal. May 21, 2020) (citations omitted).

One factor that was not — and could not have been — addressed at sentencing is the need to "provide the defendant with needed medical care." 18 U.S.C. § 3553(a)(2)(D). That factor takes on new meaning in light of Santana's current medical vulnerabilities. That factor favors relief here when the defendant's continuing health challenges are considered.

Santana reports that his family is aware of his current situation and remain supportive. Most of his family members remain in Mexico, and he states that it is his intention to reunite with them upon release.

III.

The government does not dispute that Santana has exhausted his administrative remedies. He also has established "extraordinary and compelling" reasons for relief within the meaning of 18 U.S.C. 3582(c)(1)(A)(i). The balance of the other pertinent factors does not preclude his request for relief.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 746) is **GRANTED**.

It is further **ORDERED** that the defendant's term of custody is **REDUCED** to time served.

It is further **ORDERED** that this order is stayed for up to fourteen days to allow the Bureau of Prisons to verify the defendant's residence and release plan, to notify immigration authorities, to make appropriate travel arrangements, and to ensure the defendant's safe release after the defendant is quarantined. The defendant shall be released as soon as a residence is verified, a

- 10 -

release plan is established, appropriate travel arrangements are made, quarantine is complete, and it is safe for the defendant to travel.  There shall be no delay in ensuring travel arrangements are made.  If more than fourteen days are needed to make appropriate travel arrangements and ensure the defendant's safe release, the parties shall immediately notify the Court and show cause why the stay should be extended.

It is further **ORDERED** that under 18 U.S.C. § 3582(c)(1)(A), the defendant must serve a "special term" of supervised release of seven months (in addition to the supervised release term previously ordered).  During that special term, the defendant must confine himself to his place of residence, except for work, medical appointments, religious services, and purchasing necessities. The defendant will be subject to GPS location monitoring for the first 210 consecutive days of his home confinement.  However, if the defendant is in full compliance with his conditions of supervised release, the probation officer, after 90 days, may discontinue GPS location monitoring. Moreover, this condition will be vacated if the defendant is committed to the United States Customs and Immigration Agency for removal from the country.

The Court will enter an amended judgment and commitment.

It is further **ORDERED** that if the defendant is not deported, he must provide to the probation office in the district where he will be released the complete address where he will reside upon release.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  May 19, 2021